69 U.S. 350 (1864)
2 Wall. 350
THE SLAVERS. (KATE.)
Supreme Court of United States.

*356 Messrs. Donohue, Evarts, and Gillet, for the appellants.
Mr. Assistant Attorney-General Ashton, for the United States.
*363 The CHIEF JUSTICE delivered the opinion of the court.
The libel charges that the vessel was prepared at New York, in the summer of 1860, for the purpose of trade in slaves, contrary to the acts of Congress in that behalf; by reason whereof, and by virtue of the acts, the bark, her tackle, apparel, furniture, and lading became forfeited. There is no question of the construction of the acts of Congress, prohibiting the slave-trade, or of the forfeiture, if the allegations of the libel were established by proof. The case therefore turns on the evidence.
In considering this evidence, it is to be borne in mind, that for more than three hundred years the western coast of Africa has been scourged by the atrocities of the slave-trade; and that this inhuman traffic, although at length proscribed and pursued with severe penalties by nearly all Christian nations, has continued, with almost unabated activity *364 and ferocity, even to our times. Fears of forfeiture of property, and even of life, have been easily overcome by hopes of enormous gains, and so long as markets for slaves remain open, and imperfect execution of the laws permits the expectation of profit from crime, the most conspicuous results of penal legislation will be, more cunning in the contrivance and more adroitness in the use of means for evading or defeating its intent and operation. The difficulty of penetrating the disguises of crime is enhanced in the case of the slave-trade by the circumstance that a very considerable traffic, regarded as legitimate, has sprung up and is carried on with the same African coast from which human cargoes are collected. It does not seem unreasonable, since it is the paramount interest of humanity that the traffic in men be, at all events, arrested, to require of the trader, who engages in a commerce, which, although not unlawful, is necessarily suspicious from its theatre and circumstances, that he keep his operations so clear and so distinct in their character, as to repel the imputation of prohibited purpose.
The bark Kate arrived from Havana at New York about the 17th of May, with a cargo consigned to parties there. She was then apparently owned by Benjamin Buck and Alfred Buck, of Baltimore, and was commanded by C.W. Buck as master. Some six days after her arrival, she seems to have been sold by the master, as attorney for the owners, to one Lake, for $10,500. She was registered on the 30th of May, 1860, as owned by Lake, and commanded by one Frederick Otto. Her crew-list, sworn to by Otto, on the 3d of July, 1860, does not state the rank or employment of any of the persons named, but describes one, O.F.N. Raven as born in New York, and another, Francis Stevens, as born in Louisiana. Another crew-list, made out in September, describes Raven as mate, and as born in New York, and Stevens as second mate, and as born also in New York.
The equipment of the bark was somewhat peculiar. She had an unusually large number of spars and sails; was provided with the water-casks and tanks necessary for a slaver; *365 and had a large quantity of articles, not on her manifest, suited to the purposes of the trade.
She was twice seized: first, after being cleared and having sailed on the 3d of July, 1860, for Cape Palmas and ports on the west coast of Africa; and again, after refusal of her second application for clearance and before sailing.
The shipper's manifest, dated July 3, 1860, purporting to be of part of cargo, embraced all the articles mentioned in the manifest delivered to the custom-house, and a number of barrels of beef and tongues in addition. This shipper's manifest was signed Jose Hernandez. The record shows no manifest of her second cargo; but the return of the inspectors, under whose supervision it was unladen, shows that it was composed substantially of the same articles as the first.
When the bark was first seized, she was accompanied outside the harbor by a tug, which conveyed the captain, Otto, and one Da Costa. This Da Costa had, some four years before, been indicted for slave-trading, and had forfeited his recognizance, and had evaded the officers of the law. He pretended to be a stranger to Otto; to be ignorant of our language, and to have no connection with the bark; but trunks marked with his name were found in her cabin; he was detected exchanging signs with Otto, and it was soon discovered that his ignorance of our language was a mere pretence. Hernandez, who represented himself as shipper of part of the cargo, but whose manifest of part included every article on the custom-house manifest, and several others, never appeared to protect his interest. There is reason to think that the name was but an alias for Da Costa.
Lake, who alone intervened to claim both the bark and the cargo, says that the vessel was chartered for the African voyage, and loaded with the goods of the charterer; but he does not name the charterer, nor offer any evidence of the ownership of the goods. The proof, so far as it affords any light on this point, indicates Hernandez or Da Costa as the owner. Lake asserts that he bought the vessel for $10,500; while the appraiser's valuation is at $4000. It seems highly improbable that he paid a price so disproportioned to value, *366 for the mere purpose of chartering her for an ordinary trading voyage. The charter-party is not produced, nor is any reason given for its non-production. The crew-list represented all the persons named on it as Americans born, and it was sworn to by Otto, but the proof shows conclusively, that neither the master nor mate were Americans, and deprives the oath, which represents the others as such, of all claim to credit.
We do not think it necessary to examine the evidence more in detail. The case presents none of the marks of an honest transaction, but bears upon it such indications of the guilty purpose to employ the bark in the slave-trade, that we should require clear explanation by convincing proof to repel the conclusion that such was her destined employment. But there is no such explanation. There is no attempt to clear the case of the damaging inferences which the destination of the voyage, the character of the vessel and cargo, and the character and acts of the parties prominently connected with both, irresistibly suggest.
We conclude, therefore, that both were rightly condemned by the District Court, and
AFFIRM ITS DECREE.