## UNITED STATES v. KUSHNER.

### No. 195.

Circuit Court of Appeals, Second Circuit.
May 5, 1943.

Writ of Certiorari Denied June 21, 1943.
See — U.S. —, 63 S.Ct. 1449, 87 L.Ed. —.

Samuel M. Ostroff, of New York City (Herman Mendes and Charles L. Raskin, both of New York City, on the brief), for defendant-appellant.

Robert M. Hitchcock, Asst. U. S. Atty., of Buffalo, N. Y. (George L. Grobe, U. S. Atty., of Buffalo, N. Y., on the brief), for plaintiff-appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

670

CLARK, Circuit Judge.

Five counts of an indictment brought in the district court against the appellant herein, Bernard Kushner, together with four codefendants, accused him of violating the Customs Act, 19 U.S.C.A. §§ 1593(a), 1593(b), and § 483(b), by importing and assisting the importation of undeclared gold bullion from Canada; a sixth count charged him and the others with conspiring to commit these offenses and to defraud the United States, 18 U.S.C.A. § 88. Appellant's codefendants pleaded guilty, and a jury convicted him on all counts. It was undisputed that the codefendants successfully engaged in a conspiracy between 1938 and 1942 to import undeclared gold bullion into the United States from Canada; the issue concerned the extent to which appellant, a licensed gold refiner who admittedly purchased gold from at least two of the codefendants, was connected with the affair. This appeal challenges the sufficiency of the evidence for the jury, the propriety of the court's charge and refusals of requests to charge, numerous rulings made at trial, and, initially, the illegality in any event of the importation of undeclared gold bullion. We take up the latter question first.

1. *The substantive law.* Appellant's attack on the legal theory of the prosecution centers on two main points: that gold being duty free, 19 U.S.C.A. § 1201, par. 1638, *its importation does not violate the Customs Act,* and that in any event the exclusive penalty for any unlawful dealing with gold, including importation, is under the Gold Reserve Act, 31 U.S.C.A. § 443, providing penalties for the acquisition and use of gold in violation of law.

It seems clear, however, that the statutes, 19 U.S.C.A. §§ 1461, 1484, which require the inspection and invoicing of all "merchandise" brought into the country include duty-free gold bullion. Merchandise is defined by 19 U.S.C.A. § 1401 (c) as "goods, wares, and chattels of every description and includes merchandise the importation of which is prohibited." This is broad enough to include gold. Shaar v. United States, 5 Cir., 269 F. 26; Lozano v. United States, 5 Cir., 17 F.2d 7. Hence the statutes here particularly relied on become applicable if the requisite intent is shown: § 1593(a), prohibiting smuggling "with intent to defraud the revenue of the United States,"[1] § 1593(b), prohibiting the fraudulent or knowing importation of merchandise contrary to law, or the assisting therein,[2] and § 483(b), also providing a penalty for aiding the unlawful importation of merchandise.[3]

Appellant's point that the Gold Reserve Act, 31 U.S.C.A. § 443, is exclusive stresses 31 U.S.C.A. § 446 to the effect that all laws inconsistent with that Act are repealed. But § 443 applies only to importations in disregard of regulations or licenses of the Secretary of the Treasury, issued pursuant to 31 U.S.C.A. §§ 441, 442, with a view to stabilizing the domestic monetary economy; and it is in no wise

[1] § 1593(a): "If any person knowingly and willfully, with intent to defraud the revenue of the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper, every such person, his, her, or their aiders and abettors, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in any sum not exceeding $5,000, or imprisoned for any term of time not exceeding two years, or both, at the discretion of the court."

[2] § 1593(b): "If any person fraudulently or knowingly imports or brings into the United States, or assists in so doing, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise

after importation, knowing the same to have been imported or brought into the United States contrary to law, such merchandise shall be forfeited and the offender shall be fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both."

[3] § 483(b): "Any member of the crew of any such vessel and any person who assists, finances, directs, or is otherwise concerned in the unlading, bringing in, importation, landing, removal, concealment, harboring, or subsequent transportation of any such merchandise exceeding $100 in value, or into whose control or possession the same shall come without lawful excuse, shall, in addition to any other penalty, be liable to a penalty equal to the value of such goods, to be recovered in any court of competent jurisdiction, or to imprisonment for not more than five years, or both."

inconsistent with §§ 1593(a), 1593(b), and 483(b), as here directed at the impairment of the efficiency of customs administration by a failure to declare or to invoice *any* imported gold. Each statute stands for a separate function. Cf. General Motors Acceptance Corp. v. United States, 286 U.S. 49, 52 S.Ct. 468, 76 L.Ed. 971, 82 A.L.R. 600; Farber v. United States, 9 Cir., 114 F.2d 5, certiorari denied 311 U.S. 706, 61 S.Ct. 173, 85 L.Ed. 458. Furthermore, § 443 is much more limited in scope than the penal provisions of the Customs Act. Repeals by implication are not favored; and where, as here, there are reasonable grounds for the continued effectiveness of both statutes, a repeal will not be presumed. Cf. Bookbinder v. United States, 3 Cir., 287 F. 790, certiorari denied 262 U.S. 748, 43 S.Ct. 523, 67 L.Ed. 1213; Goldberg v. United States, 8 Cir., 277 F. 211.

We need not now pass upon the case in which a violation of the Gold Reserve Act is sought to be penalized under the provisions of the Customs Act. Cf. In re 200 7/12 Dozen Wool Hose and Half Hose, 2 Cir., 263 F. 376. The lower court in its charge to the jury cautiously excluded the admitted violation of that Act here as a basis of conviction under §§ 1593(a), 1593 (b), and 483(b); and the penal provision of the Gold Reserve Act has not been invoked against appellant. The situation is thus totally unlike Palmero v. United States, 1 Cir., 112 F.2d 922, which condemned an attempt to punish twice the same violation of the Narcotic Drugs Import and Export Act, 21 U.S.C.A. § 173— once under that law and once under the Customs Act.

■■ Perhaps a more serious problem is posited by appellant's contention that the requisite intent for violation of the three statutes is lacking in any case involving duty-free merchandise, since the statutes were intended solely to prevent and punish frauds on the Government with respect to its revenue. Sec. 1593(a) does require an "intent to defraud the revenue of the United States." This hardly grammatical expression appears in certain other statutes (cf. 26 U.S.C.A. Int.Rev. Code, §§ 3321, 3323(a) (3)), but its meaning cannot be said to be wholly clear. The district court relied on the decision of Judge Augustus N. Hand in United States v. Twenty-Five Pictures, D.C.S.D.N.Y., 260 F. 851, 854, which dealt directly with the meaning of "fraudulently" in what is now § 1593(b), but added that if "proof of an intention to defraud the government" was required, "the requisite fraud need not consist of deprivation of customs revenues. The collation of information in order to pass upon the classification of merchandise, and the question often most difficult as to whether it is dutiable, and, if so, just what duty is imposed, is an important function of the revenue department of the government. Without such information, the Customs Act cannot really be enforced or the revenues collected." Judge Hand's interpretation was in line with the well settled view as to the meaning of the expression "to defraud the United States," as in the conspiracy statute, 18 U.S.C.A. § 88. Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann.Cas. 1112; United States v. Barnow, 239 U.S. 74, 79, 36 S.Ct. 19, 60 L.Ed. 155; Wallenstein v. United States, 3 Cir., 25 F.2d 708, certiorari denied 278 U.S. 608, 49 S.Ct. 13, 73 L.Ed. 534. But here there is an additional term, "revenue"; and while this may mean the revenue department, thus avoiding the difficulty of defrauding an inanimate thing, yet it seems likely that an actual loss of government income was contemplated. See Dunbar v. United States, 156 U.S. 185, 194, 15 S.Ct. 325, 39 L.Ed. 390. The Supreme Court has shown a tendency to restrict the broader meaning of defrauding whenever the circumstances suggest, even if they do not state, a narrower view. United States v. Cohn, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616; cf. Keck v. United States, 172 U.S. 434, 19 S.Ct. 254, 43 L.Ed. 505; United States v. A. Graf Distilling Co., 208 U.S. 198, 28 S.Ct. 264, 52 L.Ed. 452. The question is not free from doubt,[4] but we incline to the view that an intent to deprive the Government of revenue must be held an ingredient of the crime defined in § 1593(a). Accordingly the conviction of appellant under the first count,

---

[4] A further complication is that this statute as contained in Rev.Stat. § 2865, amended in 1877, 19 Stat. 247, then referred to "goods, wares, or merchandise, subject to duty by law, and which should have been invoiced, without paying or accounting for the duty." These pro- visions fell out in the re-enactment of the law in 1922, 42 Stat. 982. Possibly the omission was intended to extend the statute beyond goods "subject to duty by law," but the implication of intent is perhaps too faint to be trusted.

the only one which relies on this statute, must be reversed.

■ The express requirement of an intent to defraud the revenue in § 1593(a) helps to negate any inference of an implied limitation to this effect in §§ 1593(b) and 483(b), which omit such provision. It is not brought back by the term "fraudulently or knowingly" in § 1593(b), as Judge Hand demonstrated in United States v. Twenty-Five Pictures, supra. Hence, if the evidence was sufficient, conviction on the remaining substantive counts was proper. And the requisite intent for the conspiracy charge would be present, under the authorities above cited. So far as it included a reference to § 1593(a), no objection or request to charge as to that alone was made. United States v. Smith, 2 Cir., 112 F.2d 83. Since the only sentence under the first count was of imprisonment concurrent with like sentences under other counts, the reversal on this count will not, as a practical matter, reduce his punishment.

2. *The sufficiency of the evidence.* We come, then, to the important issue of the sufficiency of the evidence to convict appellant of aiding and abetting these violations of the Customs Act and of knowingly participating in a conspiracy so to do. In the conspiracy which was proved, two Canadians, Dollinger and Faibush, secured gold bullion in Canada and brought it without declaration into the United States and to the codefendants Rubin and Roth in New York City or sent it by go-betweens, Julius and Abrahams, the other codefendants. Rubin and Roth then disposed of it to a licensed refiner in this country. Advantage was taken of a favorable disparity in rates of exchange. Overt acts were shown to have occurred on September 26, 1941, when Canadian authorities observed Abrahams and Julius to cross the border after leaving Faibush's home with a bag, and on October 4, 1941, when Abrahams and Julius were stopped at the border and searched, and a concealed vest was discovered on Julius containing some $10,308 in gold bullion.

Strongly implicating appellant in the conspiracy was the testimony of Rubin, Roth, and Julius, as government witnesses, to the effect that appellant, as a licensed refiner, bought the imported gold bullion with full knowledge of its illicit origin; that on occasion Dollinger came directly to appellant's office to receive payment; and that once in 1940, appellant, together with Rubin and Julius, met Dollinger and Faibush at La Guardia Airport in New York and took them to appellant's office, where appellant assayed and paid for gold bullion taken by Faibush from a vest concealed under his clothing. They further testified that when the Canadian authorities began to hamper the activities of Dollinger and Faibush, so that it became necessary to send Julius and Abrahams for the gold, appellant paid one-half Julius' expenses. The practice was that Rubin or Roth, upon getting notice from their Canadian associates that a shipment was ready, would secure an advance against the shipment from appellant and convert it into Canadian currency, along with the balance received upon any prior shipment, less commissions to themselves, and Julius would take these funds to Dollinger or Faibush, together with assay figures and gold drillings from the prior shipment, for checking by the latter.

Corroborating this testimony was evidence that after Abrahams and Julius were arrested on October 4, 1941, a search of Faibush's home uncovered $8,653 in Canadian currency, gold drillings in envelopes similar to those used by appellant for pay rolls, and a notebook containing appellant's name and telephone number. Some of the envelopes were dated "9/26/41." Furthermore, sometime between October 3 and October 5, appellant's books for 1940 and 1941, containing the names and addresses of persons from whom gold was acquired and the amount and quality thereof, were destroyed. That these records were destroyed after Julius' arrest and thus with a motive to conceal was an inference from testimony by Roth that he telephoned appellant of Julius' arrest the day after it occurred, and by appellant's stenographer that his office was not informed of the loss of the books until October 6.

Appellant, however, denied receiving a telephone message from Roth, and set the time of the destruction of the books as the night of October 3, explaining that while checking them in his laboratory he accidentally spilt a container of sulphuric acid over them. In answer to the other incriminating testimony of his codefendants, he admitted that he bought gold during the period of the conspiracy from Rubin and Roth, trading under the name of the London Gold and Gem Company, and that he made advances to Rubin against undelivered gold. But he claimed that the gold

was scrap gold, that it was a customary practice in his trade to make advances against undelivered scrap gold, that he did not know that Rubin and Roth were importing undeclared gold bullion, and that he was unacquainted with any of the other members of the conspiracy.

■ Since the jury has drawn the inference of guilt from all this evidence, our only duty is to decide whether it was competent for the purpose, and the inference reasonable, rather than absolutely impelled by the circumstances. United States v. Valenti, 2 Cir., 134 F.2d 362. Appellant's admitted course of dealings with the codefendants, their positive testimony linking him as an accomplice, the exhibits taken at Faibush's home, and the peculiar circumstances attending the destruction of appellant's books were quite sufficient, we think, to justify the inference not only that appellant was a knowing participant in the conspiracy, but also that he "assisted" and "financed" the importations of September 26 and October 4 by advancing funds against the proposed shipments, by sharing Julius' expenses, and by standing ready to receive, conceal, and dispose of the gold after importation. Cf. United States v. Crimmins, 2 Cir., 123 F.2d 271. It is of no import that there was other evidence—chiefly appellant's testimony in his own behalf—that he was the innocent dupe of his codefendants. Determination of the weight of the evidence was the jury's function.

■ 3. *Sufficiency of the indictment.* Appellant contends that the original indictment should have been dismissed for vagueness upon motion at the end of the Government's case, and that in any event his motion for a bill of particulars was erroneously denied. The indictment charged appellant with specific violations of the particularly cited statutes, in substantially the statutory language. Ordinarily an indictment in this form is sufficient. United States v. White, C.C.S.D.N.Y., 171 F. 775; Hill v. United States, 4 Cir., 42 F.2d 812, certiorari denied 282 U.S. 884, 51 S.Ct. 87, 75 L.Ed. 706.[5] It nowhere appears that he was prejudiced by the generality of the indictment in preparing his defense; indeed, his motion for a bill of particulars showed his understanding of the charge as

a failure to declare and to invoice the imported gold. His motion for dismissal at the close of the Government's case was also based solely on the ground that the evidence did not support the charges. Furthermore, the judgment herein will be fully adequate as a bar to any subsequent prosecutions. The whole record is available to show the exact nature of the offenses charged against the accused, cf. Capone v. United States, 7 Cir., 56 F.2d 927, certiorari denied 286 U.S. 553, 52 S.Ct. 503, 76 L.Ed. 1288; and it clearly demonstrates that he has been held solely for violations of the Customs Act, §§ 1461 and 1484. The challenge to the sufficiency of the indictment, therefore, fails. Dunbar v. United States, supra; Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606; Clement v. United States, 8 Cir., 149 F. 305, certiorari denied 206 U.S. 562, 27 S.Ct. 795, 51 L.Ed. 1189. See Hill v. United States, supra, 42 F.2d at page 814, "The time has passed when convictions will be reversed in the courts of the United States for mere technical defects in pleading."

■ So, too, the denial of the motion for a bill of particulars must stand in the absence of a showing that appellant was unfairly surprised or prejudiced at the trial by the Government's evidence. Kanner v. United States, 2 Cir., 21 F.2d 285, certiorari denied 275 U.S. 564, 48 S.Ct. 122, 72 L.Ed. 428; Peck v. United States, 7 Cir., 65 F.2d 59, certiorari denied 290 U.S. 701, 54 S.Ct. 229, 78 L.Ed. 603. Actually, also, the bill partook more of the nature of a fishing expedition than of a reasonable request for information upon the part of one who denied all knowledge of or participation in the importation of any gold bullion. It unreasonably sought detailed information on such points as appellant's activities in financing, receiving, and concealing the imported gold, the value of the gold, its chemical analysis, any marks of identification on it, and the contents of appellant's lost records. Appellant was not entitled to know the Government's case in advance, and the district court did not abuse its discretion in denying the motion. United States v. Dilliard, 2 Cir., 101 F.2d 829, certiorari denied 306

---

[5] The indictment here was undoubtedly sufficient so far as it charged smuggling of identified gold at a specified date in violation of § 1593(a), for the criminal connotations of the term "smuggling" have been well established. See Keck v. United States, 172 U.S. 434, 446, 19 S.Ct. 254, 43 L.Ed. 505. But we have already ruled out the conviction upon § 1593(a) on other grounds.

U.S. 635, 59 S.Ct. 484, 83 L.Ed. 1036; Landay v. United States, 6 Cir., 108 F.2d 698, certiorari denied 309 U.S. 681, 60 S. Ct. 721, 84 L.Ed. 1024.

4. *Rulings at trial.* Counsel for the appellant, cross-examining a United States Customs Agent, queried what would have happened if defendant Abrahams had presented the gold to the Customs authorities at the border with a permit from the Canadian authorities for its exportation. The witness answered that Abrahams could not have secured such a permit, "because the gold was stolen." The court immediately struck out the answer and ordered the jury to disregard the statement. Appellant now complains that the judge did not go further and grant his motion to withdraw a juror. The complaint under these circumstances is clearly without merit. Cf. United States v. Salli, 2 Cir., 115 F.2d 292. Appellant's rights were accorded ample protection, especially since the testimony had no bearing whatsoever upon the real question at issue, which was whether appellant had participated in the illegal importations of gold bullion.

Error is assigned as to the admission of photostatic copies of Chase National Bank statements, admittedly appellant's, one of which referred to a $15,000 withdrawal on February 13, 1940. The Government relied on this item to corroborate Julius' testimony that in early February, 1940, appellant had met him at the Chase National Bank and handed him $15,000 in cash. The statements were clearly competent for this purpose, and appellant's failure to explain or to recollect the withdrawal was a circumstance which the jury might properly take into account in weighing his guilt. The use of the photostatic copies was not excluded by the best evidence rule, for their contents were not questioned. See 4 Wigmore on Evidence, 3d Ed. 1940, § 1191. Obviously, also, they were no whit less reliable than the originals. Cf. United States v. Manton, 2 Cir., 107 F.2d 834, 845, certiorari denied 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012; Hartzell v. United States, 8 Cir., 72 F.2d 569, 583, certiorari denied 293 U.S. 621, 55 S.Ct. 216, 79 L.Ed. 708; 3 Wigmore on Evidence, 3d Ed., § 797.

5. *The court's charge.* Numerous exceptions have been taken to the court's charge to the jury and to refusals of requests to charge. Appellant urges that the court should have instructed the jury that the testimony of appellant's character witnesses "alone in and of itself may create in your minds the reasonable doubt" requiring acquittal. This instruction is supported by Edgington v. United States, 164 U.S. 361, 366, 17 S.Ct. 72, 41 L.Ed. 467. The trial judge was not required to adopt the precise words selected by appellant's counsel; and had he been content merely to leave the force and effect of the character testimony to the jury, that would have been a sufficient statement of the applicable law. Linn v. United States, 2 Cir., 251 F. 476. But he went further and said that "where the evidence is equally balanced in the minds of the jury," proof of good character might be determinative. The negative implication thus conveyed is contrary to the Edgington case, supra, and the charge should not have been given.

Reversal, however, does not follow as of course, but only if the charge appears to have been substantially prejudicial to the rights of the accused. United States v. Salli, supra; Kalmanson v. United States, 2 Cir., 287 F. 71; Rosen v. United States, 2 Cir., 271 F. 651; 28 U.S.C.A. § 391. The record strongly indicates appellant's guilt. The instruction on this point constituted a very brief part of a long charge. The character evidence itself was meager, being limited to the testimony of three of appellant's business associates that his reputation for honesty and veracity and fair dealings was good. Cf. Kreiner v. United States, 2 Cir., 11 F. 2d 722, certiorari denied 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1152, to the effect that testimony of good reputation does not have the standing of testimony of good character; and see 1 Wigmore on Evidence, 3d Ed., § 56, n. 4. We do not believe that this testimony had an important share in the result, or that the ends of justice will be served by a reversal.

Appellant complains further that the judge did not admonish the jury that any violation of the Gold Reserve Act or of any regulations promulgated thereunder should not be considered; but as we have already noted, the court expressly, if cautiously, did just that. Other objections to the court's charge are similarly without merit and in no wise prejudicial to appellant's right to a fair trial.

The judgment of conviction on the first count is reversed; the other judgments are affirmed.